IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRANK SCOGNAMILLO, et al.,

    Plaintiffs,

v.

CREDIT SUISSE FIRST BOSTON, LLC f/k/a CREDIT SUISSE FIRST BOSTON CORPORATION, et al.,

    Defendants.

NO. C03-02061 TEH

ORDER DENYING LEAVE TO FILE A SIXTH AMENDED COMPLAINT

This matter came before the Court on Monday, September 22, 2008, on the Plaintiffs' Motion for Leave to File a Sixth Amended Complaint. Having carefully considered the parties' written and oral arguments, and the record therein, Plaintiffs' Motion is DENIED for the reasons set forth below.

**BACKGROUND**

In this matter, Plaintiffs merged their company, UVN Holdings, Inc., with Netcentives, Inc., primarily in exchange for stock in Netcentives. After the sale, the Netcentives stock price dropped significantly, and Plaintiffs lost millions of dollars. Plaintiffs brought this suit against Credit Suisse First Boston ("CSFB"), which served as financial advisors to Netcentives, and two Netcentives executives. This case was originally filed in the United States District Court for the District of Arizona and was transferred to this Court in May of 2003. The Court granted Plaintiffs leave to file a Second Amended Complaint in January of 2004. On stipulation of the parties, a Third Amended Complaint was filed in May of 2004.

Defendants filed multiple motions to dismiss in July of 2004, and in September of 2004, the Court stayed all discovery and set a sequential briefing and hearing schedule for

the motions. In March, 2005, the Court granted in part and denied in part the motion to dismiss of Defendant CSFB. The Court granted the motions to dismiss of Defendants Longinotti, Shell, and Quattrone in August, 2005.

The Court again granted Plaintiffs leave to filed a Fourth Amended Complaint, which was filed in October, 2005. The parties first extended the time to respond to the Fourth Amended Complaint, and then agreed that Plaintiffs would simply file a Fifth Amended Complaint. The Fifth Amended Complaint was filed in late November, 2005.

Plaintiffs now move to file a Sixth Amended Complaint. They claim that the new complaint merely refines the causes of action on the basis of discovery first received in 2008 – not for lack of diligence on Plaintiffs' part, but because of "a combination of good faith disagreement, misunderstanding, oversight, and 'drilling down'" on discovery responses. Mot. at 11. Defendants oppose the motion on three grounds:

1)   that the new complaint represents a radical departure from the Fifth Amended Complaint such that allowing amendment will unfairly prejudice Defendants;
2)   that Plaintiffs unduly delayed in amending their complaint because they had the information they needed to plead their new theories as early as 2005; and
3)   that the amendment would be futile, because the misrepresentations and omissions alleged in the Sixth Amended Complaint are not actionable.

**LEGAL STANDARD**

Amendment under Fed. R. Civ. Pro. 15(a) is discretionary, and is generally permitted with "extreme liberality." *Chodos v. West Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)). The non-moving party bears the burden of demonstrating why leave to amend should not be granted. *Genentech, Inc. v. Abbott Labs.*, 127 F.R.D. 529, 530-31 (N.D. Cal. 1989).

When a district court has already granted leave to amend, its discretion in deciding subsequent motions to amend is "particularly broad." *Wagh v. Metris Direct, Inc.*, 363 F.3d

821, 830 (9th Cir. 2003), *overruled on other grounds by Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc); *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 879 (9th Cir. 1999). "[A] district court need not grant leave to amend where the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006); *see also Chodos,* 292 F.3d at 1003 ("When considering a motion for leave to amend, a district court must consider whether the proposed amendment results from undue delay, is made in bad faith, will cause prejudice to the opposing party, or is a dilatory tactic."); *Foman v. Davis*, 371 U.S. 178, 182 (1962). The factors are not of equal weight. "Prejudice to the opposing party is the most important factor," *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990); delay alone is insufficient to deny leave to amend. *United States v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981) (citing *Howey v. United States*, 481 F.2d 1187 (9th Cir. 1973)).

**DISCUSSION**

**I.     The Two Complaints**

Both the Fifth and Sixth Amended Complaints allege that Defendant CSFB underwrote the initial public offering ("IPO") of Netcentives, Inc. ("Netcentives") on October 13, 1999. Shortly after the IPO, Plaintiffs and Netcentives began to discuss a possible merger between Netcentives and Plaintiffs' company, UVN Holdings, Inc. ("UVN") Netcentives brought two CSFB employees, Defendants George F. Boutros and Storm Duncan, into the merger discussions in early November, 1999. In reliance on the IPO Prospectus, various representations and assurances by Duncan, Boutros, and others, Plaintiffs agreed to the merger of UVN with Netcentives in exchange for shares of Netcentives stock supposedly worth $27 million and subject to a one-year restriction on resale. The merger closed on March 3, 2000. The value of Netcentives shares declined precipitously thereafter. By the time Plaintiffs were able to sell their shares, the stock price had plummeted from a

3

1 high of $96 per share to less than $2 per share. In late 2001, Netcentives was liquidated in
2 bankruptcy, and Netcentives shareholders, including Plaintiffs, recovered nothing.

3 The complaints differ significantly, however, in their explanation of Defendants'
4 alleged wrongdoing. The Fifth Amended Complaint unquestionably focuses on Defendants'
5 alleged manipulation of Netcentives' stock price, their misrepresentations to Plaintiffs, and
6 their failure to reveal those practices in the Netcentives IPO Prospectus and in meetings with
7 and representations to Plaintiffs.[1]

8 The Fifth Amended Complaint described the improper share price manipulations at
9 length. There, Plaintiffs alleged that Defendants used "tie-in arrangements," including
10 "laddering" and profit sharing with customers (disguised as high commissions to CSFB) to
11 inflate the share price, allocated Netcentives IPO shares to businesses based on the amount of
12 business they would generate for CSFB, and "caused favorable equity research analyst
13 reports and investment recommendations to be issued" to boost the market price – practices
14 that did not comply with the rules and regulations of the SEC or NASD. 5AC ¶¶ 144-52,
15 157-67. The Fifth Amended Complaint listed examples of how CSFB engaged in similar
16 practices with other companies, such as improper "flipping activity," and alleged that senior
17 members of CSFB business units knew of the practices and participated in them. *Id.* ¶¶ 168-
18 90, 193-98, 200-14. The Fifth Amended Complaint also claims that CSFB even
19 compensated its employees for "their success in carrying out such unlawful manipulative
20 conduct." *Id.* ¶ 8.

21 In the Fifth Amended Complaint, Plaintiffs further asserted that CSFB's Registration
22 Statement and IPO Prospectus for Netcentives, and subsequent Form 10K and Form 10Q
23 Reports, made representations about the share price and how shares would be sold, but failed
24 to disclose Defendants' manipulative practices, such as the laddering and IPO allocations

---

[1] The Third Amended Complaint similarly focused on three categories of misrepresentations: those about the IPO and Prospectus that failed to reveal the market manipulations, those about the business prospects of Netcentives (contracts and possible acquisition by another company), and those about Plaintiffs' continued involvement in the company. Order Granting in Part and Den. in Part the CSFB Defs.' Mot. to Dismiss, March 21, 2005, at 10-14.

4

described above, or the conspiracy to artificially inflate the price. *Id.* ¶¶ 10, 215-22. The Fifth Amended Complaint made a wide array of additional allegations of misrepresentation against Defendants, namely: that Defendants knew of these omissions but never disclosed them, *id.* ¶ 15; that Defendants republished the incomplete information in the Prospectus and reports to Plaintiffs by urging them to rely on the Prospectus during merger talks, *id.* ¶ 73; that Boutros, Duncan, and others induced Plaintiffs to rely on their assessment of the value of Netcentives, *id.* ¶ 100; that they told Plaintiffs they had confidential information that another company planned to acquire Netcentives at a high share price, *id.* ¶¶ 116-17, 122; that Plaintiffs should trust them that Netcentives would be successful and able to dominate the marketplace for loyalty programs, *id.* ¶ 87; that Defendants told Plaintiffs that they didn't need to retain their own financial advisor because CSFB was the "underwriter and market maker" for Netcentives shares, *id.* ¶¶ 85-95; that Boutros and Duncan knew of the improper manipulation of the Netcentives share price throughout the merger negotiations, but failed to disclose them at any time, *id.* ¶¶ 84, 13, 15. In sum, in the Fifth Amended Complaint, Plaintiffs asserted that these misrepresentations and omissions misled Plaintiffs about the true financial condition and value of Netcentives, *id.* ¶ 4, and that Defendants owed fiduciary duties to Plaintiffs, *id.* ¶ 40, but instead fraudulently induced them to enter the merger. Plaintiffs also alleged that Defendants misled them into believing they would be part of a joint management team of the merged companies, when they "had never intended that Netcentives would stand behind their pre-closing inducement representations" that Plaintiffs would have a management role. *Id.* ¶ 139; *see generally* ¶¶ 125-39.

The Fifth Amended Complaint asserted ten counts against the Defendants. The first was for Breach of Fiduciary Duty – specifically, the failure to disclose their engagement in market manipulations, the lack of completed contracts with other companies, Netcentives' true intent to exclude Plaintiffs from management, omissions and misrepresentations in the Prospectus, the steps they took to artificially inflate Netcentives' share price, and the recommendation that Plaintiffs consummate the merger. *Id.* ¶¶ 244-49.

5

1    Count II, against Boutros and Duncan, was for Aiding and Abetting Breach of
2 Fiduciary Duty, based in part on representations that they would act as investment advisors to
3 Plaintiffs and failure to disclose the share price manipulations. *Id.* ¶¶ 250-54. Counts III and
4 IV were for Negligence, alleging that CSFB breached its duties as a registered investment
5 advisor and broker-dealer, and as an underwriter of the Netcentives IPO, by failing to use
6 reasonable care in preparing the IPO Prospectus, affecting public offering of Netcentives
7 shares, and providing appropriate aftermarket trading, and that Boutros and Duncan breached
8 their duty of reasonable care by arranging and recommending the terms of the merger, failing
9 to disclose market manipulations, and not complying with SEC and NASD rules. *Id.* ¶¶ 255-
10 70. The Fifth Amended Complaint asserted claims of Negligent Misrepresentation (Counts
11 V and VI, *id.* ¶¶ 271-89), Fraud (Count VII, *id.* ¶¶ 290-301), and various violations of
12 California's Civil and Corporations Codes (Counts VIII-X, *id.* ¶¶ 302-26).

13    The Sixth Amended Complaint, on the other hand, shifts the market manipulation
14 theory into the background. It instead alleges a broader theory that Defendants knew from
15 their research that Netcentives was financially unsound and destined to fail, yet they
16 misrepresented that potential in the Prospectus and in merger talks. Under the theory of the
17 case propounded in the Sixth Amended Complaint, Plaintiffs claim that CSFB conspired with
18 Netcentives, and agreed to make false or misleading statements, enter into unlawful
19 arrangements, and falsely promote the merits of Netcentives in connection with underwriting
20 and distribution of the IPO, the merger negotiations, and other transactions in order to inflate
21 the price of Netcentives shares. 6AC ¶ 67. Its strategy was to improperly inflate the price,
22 profit from the IPO underwriting, trading profits, and merger and acquisition fees, and then
23 unload the company before the hype was discovered. *Id.* ¶ 46.

24    The claims in the Sixth Amended Complaint hinge on the dual premises that
25 Defendants failed to disclose both CSFB's general practices in the market that affected share
26 price, and their actual knowledge that Netcentives was financially unsound. Plaintiffs'
27 central allegations are that Defendants failed to reveal either in the IPO Prospectus or in later
28 discussions with Plaintiffs that:

6

- CSFB was using a different mode of analysis to evaluate e-commerce companies that focused "solely on rapid forecasted revenue growth and 'first mover advantage,' regardless of the forecasted costs and losses." *Id.* ¶ 33.

- CSFB required its clients to take allocations of all IPOs, both good and bad, to ensure it wasn't left with undersubscribed IPOs. This practice fed investors' "herd mentality" and helped create momentum in the dot.com field without meaningful scrutiny by research analysts or the investing public. *Id.* ¶ 82(h)(i).

- CSFB tacitly agreed with other companies that it would publish favorable research reports so long as they used CSFB's investment banking services. In this case, for example, CSFB's pitch to underwrite Netcentives contained a prototype of a post-IPO research report" on Netcentives showing "strong buy." *Id.* ¶ 82(j).

- Research analysts' compensation was tied to how much they contributed to generating investment-banking revenues. *Id.* ¶ 82(k).

Plaintiffs claim that Defendants hid the fact "that CSFB knew from its due diligence at least three weeks before the October 13, 1999 IPO that Netcentives was destined to fail," *id.* ¶ 84, knowing but failing to reveal, either in the Prospectus or merger talks, that:

- Lise Buyer, CSFB research analyst, had given a "dismal" evaluation of Netcentives, opining it had a "horrible business model" as late as September, 1999, *id.* ¶¶ 35-36, 40, 44-45, yet later had a "teach-in" on how to present Netcentives by focusing on the concept rather than projected revenues and costs. *Id.* ¶ 37.

- Although the "Use of Proceeds" section of the IPO Prospectus said Netcentives had not budgeted beyond one year, CSFB had in fact forecasted for three years, and the forecast showed increases in operating losses. *Id.* ¶ 43(a). Lise Buyer's forecasts for 2002 and 2003 showed "continuing heightened losses on heightening sales." *Id.* ¶ 54.

- CSFB analysts in fact believed that Netcentives' business model was bound to fail, *id.* ¶ 43(b), (g), and that it could not survive as a "stand-alone public company." *Id.* ¶ 57(c).

- Netcentives was profoundly vulnerable to any changes in merchant purchases of ClickMiles, *id.* ¶ 43(c), (e)-(f), and the Prospectus improperly understated the threat of competing companies. *Id.* ¶ 43(d), (h).

Nonetheless, in the Sixth Amended Complaint, Plaintiffs assert that CSFB continued to promote Netcentives as having a "predictable business model" and a "compelling value proposition." *Id.* ¶ 45. CSFB caused positive research reports to be published, published "buy" and "strong buy" recommendations, and continued to promote Netcentives well into 2001, *id.* ¶¶ 69-71, even when an April, 2001 analysis predicted that Netcentives would have a "negative cash balance" of over $50 million by the end of 2001. *Id.* ¶¶ 73-75.

7

1        Plaintiffs further maintain that at the December 1999 and January 2000 meetings, Duncan and Boutros falsely assured the Plaintiffs that Netcentives was in good financial health and that the Prospectus was accurate. *Id.* ¶ 48. Their assurances that Netcentives would not need additional financing were false. *Id.* ¶ 49. When Boutros and Duncan assured Plaintiffs that "new, continuing, positive developments" that would make Netcentives stronger financially were in the works, they failed to disclose that costs would continue to "dwarf" revenue. *Id.* ¶¶ 50-51. Duncan did not disclose that a marketing agreement with AOL had no real value, and their claim that another company would acquire Netcentives was false. *Id.* ¶¶ 52, 53(f). Duncan failed to disclose that he had never attempted to value Netcentives. *Id.* ¶ 55. Defendants never disclosed that CSFB signed an advisory agreement to represent Netcentives in the UVN/Netcentives merger. *Id.* ¶ 57(d).

         Additionally, the Sixth Amended Complaint repeats the allegations that Boutros and Duncan induced Plaintiffs to rely on their advice, reputations, and assessments of Netcentives, and so did not need their own financial analysis. It further asserts that Defendants failed to disclose their true evaluation of UVN and their plans for Plaintiffs in the new merged company: they did not reveal that they insisted on a $5 million "haircut" in the merger price because Netcentives had projected lower revenues for UVN than UVN had forecasted, and was not as sanguine about the deal as it seemed. *Id.* ¶¶ 53, 57. They did not disclose that they intended to present Plaintiffs with one-year employment contracts rather than two-year contracts at the final stages of the merger negotiations. *Id.* ¶ 57(b)(i).

         Allegations relating to improper market manipulation are nearly absent from the Sixth Amended Complaint. Although it mentions CSFB's improper practices with other companies, it alleges only that CSFB persuaded "at least one customer to participate in laddering" on the Netcentives IPO. *Id.* ¶ 82(d)(i).

         The first count of the Sixth Amended Complaint is for Negligence (formerly Count III of the 5AC): Defendants owed a duty to use reasonable care in providing their services as registered securities broker dealers, registered representatives with the NASD, and investment advisors. They breached their duty to disclose the outcome of their due diligence

8

in the underwriting process and in recommending the merger to Plaintiffs. *Id.* ¶¶ 122-26. Count II is for Negligent Misrepresentation (Counts V and VI of the 5AC), and alleges that Defendants made material misrepresentations and omissions in the IPO Prospectus or recklessly permitted them. *Id.* ¶¶ 127-35. Count III, for Fraud, is essentially identical to Count VII of the Fifth Amended Complaint. *Id.* ¶¶ 136-46. Counts IV and V, for Breach of Fiduciary Duty and Aiding and Abetting that breach, formerly Counts I and II of the Fifth Amended Complaint, simply incorporate previous allegations. *Id.* ¶¶ 147-52. Count VI, alleging violations of California's Civil Code, adds more detail to Count VIII of the Fifth Amended Complaint: the former version stated that Defendants made misrepresentations and omissions about "the Netcentives IPO and Netcentives' market price and financial position at the time of the Merger," 5AC ¶ 303, whereas the new version states that Defendants misrepresented "the Netcentives IPO, Netcentives' market price, its financial position, cash burn, etc.; they concealed their knowledge that NCNT was likely to fail on December 21, 1999, January 14, 2000, and March 1, 2000; and they failed to remedy same prior to the closing." 6AC ¶ 154. The remaining counts are similar to those in the Fifth Amended Complaint.

## II. Whether Defendants Will Be Unduly Prejudiced By Amendment

Prejudice to the opposing party is the most important factor affecting whether the Court should grant leave to amend. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971) (trial court "required" to take potential prejudice into account in deciding Rule 15(a) motion). Judge Martin Jenkins recently observed:

> Prejudice is heightened when a Plaintiff seeks to amend a complaint late in litigation. *See Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir. 1989). Such prejudice may result when the new allegations add claims based on different legal theories or require proof of different facts. *See, e.g.*, *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387-88 (9th Cir. 1990) (affirming denial of leave to add claims based on different legal theories and requiring proof of different facts). Other courts have found intolerable prejudice when plaintiffs have sought to add defendants a month before the close of discovery when nearly all pre-trial work was complete. *See, e.g.*, *Acosta-Mestre v. Hilton Intern. of Puerto Rico*, 156 F.3d 49, 52-53 (1st Cir. 1998) (reasoning that the current defendant would be prejudiced by additional

9

1  discovery and postponement of trial because defendant might have to alter
strategy and tactics to deal with theories involving the new defendants);
2  *Ferguson v. Roberts*, 11 F.3d 696, 706 (7th Cir. 1993) (noting that increased
complexity would have resulted if leave to amend to add new claims had been
3  granted); *Callan v. Amdahl Corp.*, Civ. No. C-94-0295, 1995 U.S. Dist. LEXIS
5684, *13-*15 (N.D. Cal. Apr. 24, 1995) (denying leave to amend "fourteen
4  months after plaintiff first filed his complaint, only two weeks before the
discovery cut-off and two months before trial," even though "plaintiff
5  complains he could not file his proposed amended complaint until he had
received certain discovery from defendants").

6

7 *Netbula, LLC v. Bindview Dev. Corp.*, No. C06-00711, 2007 WL 2221070, at *4 (N.D. Cal.

8 Aug. 2, 2007) (finding undue prejudice where proposed amendments come after the close of

9 discovery, and involved adding Doe defendants, two new claims, and new factual

10 allegations).

11        Similar factors are present in the instant motion. Plaintiffs sought leave to amend late

12 in litigation, approximately twelve weeks before the current December 19, 2008 discovery

13 cutoff. The new theories that Plaintiffs propound in their proposed Sixth Amended

14 Complaint are a radical departure from those asserted in the Fifth Amended Complaint.

15 Granting leave to amend at this point would require extensive additional discovery on

16 entirely new topics and the redeposition of witnesses, on top of the significant discovery that

17 has occurred to date, which includes over 300,000 pages of documents and twenty-four third-

18 party subpoenas and depositions, including those of four named parties. Specifically, in

19 order to defend on the new theory of the case that Plaintiffs now proffer, Defendants would

20 have to explore the fundamentally new contention that Defendants knew Netcentives was

21 "doomed to fail" – which would entail discovery into the financial status of Netcentives at

22 the time of the IPO. Defendants claim it may require deposition of Netcentives employees

23 uninvolved in the merger, more discovery about what persons involved in the IPO knew and

24 when they knew it, and will require hundreds if not thousands of hours of attorney time.

25 Opp. at 16-17. Plaintiffs further fail to dispute that amendment to focus on what is simply a

26 new legal theory of the case will require entirely new discovery.

27

28

10

1     Although Plaintiffs accurately note that this theory was mentioned in bullet point 3 of
2 paragraph 231 of the Fifth Amended Complaint,[2] that subsection focused exclusively on
3 damages, not on theories of liability. In the Sixth Amended Complaint, Plaintiffs have
4 substantially changed their theory of the case, from one focused entirely on unlawful or
5 improper "market manipulations" to a far broader general claim that CSFB knew Netcentives
6 would fail, but promoted it in their Prospectus and with rosy evaluations anyway.
7 Recentering their theory of liability at this point on what previously was a peripheral
8 damages matter seems to be the essence of unfair prejudice because of the surprise it poses to
9 Defendants. The import of the shift between the two complaints is further demonstrated by
10 the Plaintiffs' newfound reliance in the Sixth Amended Complaint on the statements of Lise
11 Buyer, an employee of CSFB, who simply was not mentioned in the Fifth Amended
12 Complaint.
13     In light of these facts, this Court finds that Defendants will suffer severe prejudice if
14 Plaintiffs are allowed to shift the focus of the case five years after the suit was first filed and
15 three months before the current discovery cutoff. The shift in legal theories will "nullif[y]
16 prior discovery [and impose] the burden of necessary future discovery," which will drag the
17 case on even longer. *Jackson,* 902 F.2d at 1387 (9th Cir. 1990) (relying on *Priddy v.*
18 *Edelman,* 883 F.2d 438, 447 (6th Cir. 1989)) ("Putting the defendants 'through the time and
19 expense of continued litigation on a new theory, with the possibility of additional discovery,
20 would be manifestly unfair and unduly prejudicial.'"); *AmerisourceBergen Corp.,* 465 F.3d

---

[2] Plaintiffs specifically state that

> Defendants ignore that . . . Plaintiffs had pled in the [Fifth Amended Complaint] that Defendants had made misrepresentations regarding Netcentives' business and financial condition . . . . [F]or example . . . the third bullet point of ¶ 231 of the [Fifth Amended Complaint] had already placed Defendants on notice in 2005 that they were alleged to have 'made material misrepresentations and omissions regarding the business and financial condition of Netcentives [and] [i]f these misrepresentations had been true, Netcentives would have continued as a viable company even after the manipulations, misrepresentations and omissions had ceased."

Reply at 5.

11

at 953 (finding prejudice where allowing amendment that propounded a new theory "would have unfairly imposed potentially high, additional litigation costs on [defendant] that could have easily been avoided had [plaintiff] pursued its 'tainted product' theory in its original complaint or reply"); *Morongo Band of Mission Indians*, 893 F.2d at 1079 ("The new claims set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense . . . . In light of the radical shift in direction posed by these claims, their tenuous nature, and the inordinate delay, we conclude that the district court did not clearly abuse its discretion in denying leave to amend."); *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir. 1994) (affirming denial of leave to amend where the district court reasoned that the parties had already "'engaged in voluminous and protracted discovery,' [t]rial was only two months away, and discovery was completed," and observing that "'[e]xpense, delay, and wear and tear on individuals and companies count toward prejudice'"). As the Ninth Circuit has found that "[p]rejudice to the opposing party is the most important factor," *Jackson*, 902 F.2d at 1387, the weight of this factor alone would be sufficient to deny leave to amend, particularly in light of the broad discretion this court has on a subsequent motion for leave to amend.

### III.   Whether Plaintiffs Unduly Delayed In Moving To Amend Their Complaint

Undue delay is a second factor for the Court to weigh in determining whether to grant leave to amend. The Ninth Circuit has held that "[u]ndue delay has occurred when a party has filed a motion for leave to amend long after it should have become aware of the information that underlies that motion." *IXYS Corp. v. Advanced Power Tech., Inc.*, No. C 02-03942, 2004 WL 135861, at *4 (N.D. Cal. Jan. 22, 2004) (citing *Jackson*, 902 F.2d at 1388).[3] Defendants argue that the majority of documents newly cited in the Sixth Amended

---

[3] In other cases, the Ninth Circuit has construed the "delay" factor to refer to issues like those in the "prejudice" analysis set out above – whether the proposed amendment would cause delays in the operative trial schedule or delays the case for new discovery and responsive pleadings. *See IXYS Corp.*, 2004 WL 135861, at *4 (citing *Loehr v. Ventura County Cmty. Coll. Dist.*, 743 F.2d 1310, 1320 (9th Cir. 1984)).

12

Complaint were produced nearly a year and a half ago, and the key documents that underlie the claims were disclosed with the initial production in 2005. In fact, Defendants argue, Plaintiffs' new theory arises almost entirely out of three emails written by CSFB analyst Lise Buyer on September 9, 10, and 27, 1999, which were produced on November 21, 2005.[4] Defendants argue that the Court should deny the motion because Plaintiffs unreasonably delayed in asserting their new theories until long after they learned the facts on which the theories are based.[5]

In response, Plaintiffs argue broadly that the recently-received discovery included "[m]aterial and persuasive documentation supporting the earlier produced negative opinions about Netcentives that Buyer had expressed" in the three emails. Mot. at 9. Plaintiffs argue that although they had many documents in 2005, it takes time to analyze 300,000 financial documents, and the import of some was not apparent until seen in the light of subsequent discovery; "[i]t was only with the aid of the Defendants' 2008 production and the 2008 depositions to-date that Plaintiffs were able to 'connect the dots' sufficiently to provide context to the September 9-10, 27, 1999 opinion e-mails of Lise Buyer, and to plead credible, factual allegations" that Defendants knew or should have known before the IPO that Netcentives was destined to fail. Reply at 3. Buyer's emails alone, without the subsequently disclosed documents which provided the facts and investigation on which Buyer based her opinions, would have been insufficient, according to Plaintiffs.

---

[4] Defendants initially disclosed approximately 300,000 pages of documents in November, 2005, a few days before the Fifth Amended Complaint was filed, but after a draft had been circulated to the Defendants.

[5] The Ninth Circuit concluded that the District Court did not abuse its discretion in finding undue delay, for example, where fifteen months passed between the time the plaintiff discovered new facts and asserted a new theory based on those facts in a motion for leave to amend. *AmerisourceBergen Corp.*, 465 F.3d at 953 (9th Cir. 2006) (citing *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 799 (9th Cir. 1991)) ("[A]n eight month delay between the time of obtaining a relevant fact and seeking a leave to amend is unreasonable."). It affirmed the trial court's denial of leave to amend on the basis of delay and prejudice to the opposing party, because plaintiff's new theory inexplicably contradicted its prior admissions, and would impose additional litigation costs. *Id.* at 953-54.

13

To support this argument, however, Plaintiffs only mention six documents specifically – each of which Defendants argue is either not new or at best peripheral to the new claims asserted in the Sixth Amended Complaint.

- A DVD recording of Lise Buyer's "teach-in" about Netcentives and how to market it, in which she explained that sales staff should "focus on the concept, and not necessarily [] focus on the numbers," 6AC ¶ 37, was produced in April, 2008.  Mot. at 6-8.  The Sixth Amended Complaint relies on this meeting to argue that CSFB promoted Netcentives even though it knew Netcentives was financially unsound and that CSFB was using unorthodox accounting principles.   Defendants argue that there is no key allegation of the new complaint tied to this evidence, and Plaintiffs have long been aware of all changes in CSFB's accounting methods.

- In June, 2008, Plaintiffs received a document presenting April 6, 1999 Netcentives forecasts to CSFB's Investment Banking Committee.  Defendants argue that they disclosed a virtually identical document with the very same forecasts in 2005,[6] but Plaintiffs say the import of the recent disclosure is that it shows it was emailed to Lise Buyer before she prepared her evaluation.

- An email exchange that Plaintiffs say suggests CSFB was willing to modify its forecasts to "paint a rosier picture" of Netcentives' growth was also first produced recently.  Defendants suggest that this email is ambiguous at best.

---

[6] *Compare* Strauss Decl. In Opp'n to Pls.' Mot. to Amend ("Strauss Decl.") Exh. H, CSFB-SCOG 0308965, (produced in 2008), *with* Strauss Exh. L, CSFB-SCOG 0262141 (produced in 2005).

14

- In February, 2008, Plaintiffs received an email exchange of October 22, 1999, in which Lise Buyer said the Netcentives model was a "disaster" and that included certain spreadsheet forecasts for Netcentives. Plaintiffs used the spreadsheets to argue that although CSFB's Prospectus mentioned only a one-year forecast, CSFB had actually done forecasts through 2002 that showed Netcentives' position worsening. 6AC ¶¶ 43(a), 44. Defendants first point out that the email obviously refers to CSFB's *financial* model as a "disaster," not Netcentives' business model. Second, however, Defendants argue that the knowledge that CSFB had actually forecast through 2003 was not new; Defendants produced similar projections to Plaintiffs in 2005, and projections for 1999, 2000, and 2001 were not only disclosed in 2005 but released publicly in 1999. Strauss Decl. ¶ 46 and Exh. K.

- Finally, Plaintiffs refer to a recently-produced February, 2000 email responding to Netcentives' interest in secondary financing. Plaintiffs contend that this email shows that Boutros and Duncan's assurances three weeks earlier that Netcentives would not need additional financing were false. Defendants argue simply that the document does not support the inference, and therefore doesn't justify seeking leave to amend to assert a theory that CSFB knew but did not disclose Netcentives was doomed to fail.

In addition, Defendants list every single document referred to in the Sixth Amended Complaint and the date it was produced. Strauss Decl. ¶¶ 16-43. Most were produced before February, 2007. Apart from those mentioned by Plaintiffs in their motion above, the bulk of those produced in the last two years refer to peripheral arguments: CSFB's practice of requiring its customers to take "bad" IPO shares along with "good" ones (CSG 044145 (Strauss Decl. ¶ 31), CSG 158784 (Strauss Decl. ¶ 33)), interview of John E. Schmidt, (CSFB-SCOG 0307759 (Strauss Decl. ¶ 39), CSFB-SCOG 0307913 (Strauss Decl. ¶ 40)), an

15

email suggesting analyst bonuses are linked to banking deals (CSFB-SCOT 0308906 (Strauss Decl. ¶ 41)), and background on Frank Quattrone (CSG 129645 (Strauss Decl. ¶ 32)).[7]

It is not entirely clear when Plaintiffs possessed all of the discovery necessary to piece together their new legal theory. The addition of just a few allegedly incriminating documents or incidents could arguably make the difference between this flimsy theory and no theory at all. It is clear to this Court, however, that Plaintiffs unreasonably delayed with respect to at least *some* of their theories. None of the six allegedly key documents described above relate to the allegations, for example, that CSFB failed to disclose its new model for evaluating internet companies, 6AC ¶ 33, weaknesses in Netcentives' business, *id.* ¶ 43, that a marketing agreement with AOL had no real value, *id.* ¶ 52, the fact that Netcentives was not as enthusiastic about UVN and the merger as it represented it was during merger negotiations, *id.* ¶ 53, that Duncan had never attempted to value Netcentives, *id.* ¶ 55, or that CSFB signed an advisory agreement to represent Netcentives in the merger. *Id.* ¶ 57(d).

Plaintiffs have long had access to the information on which they based their new theory of the case, and delayed in seeking leave to amend their complaint. Although delay alone is insufficient to deny leave to amend, *Webb*, 655 F.2d at 980, it is relevant to the Court's exercise of discretion, and further supports the denial of leave to Plaintiffs. *Morongo Band of Mission Indians*, 893 F.2d at 1079 (citing *Loehr*, 743 F.2d at 1319-20).

## IV.     Whether The Amendment Would Be Futile

Defendants also argue that the amendments would be futile because the conduct and omissions alleged in the Sixth Amended Complaint are not actionable and do not state a claim. Specifically, they argue that:

---

[7] The parties also argue halfheartedly over whose fault it was that the recent disclosures were made so late in the litigation. Defendants argue the delay was attributable to Plaintiffs, as Defendants asserted their objections early on and stood on them for years; Plaintiffs only sought to follow up on their first Request for Production in 2008. Plaintiffs counter that they were not dilatory; even Defendants recognized in correspondence that in 2005 they were not able (for technological reasons) to identify all documents responsive to the Plaintiffs' requests for production.

16

1 • Lise Buyer's statements are nonactionable statements of opinion. Opp. at 18-19.

3 • The alleged omissions and misrepresentations about Netcentives' chance of success are nonactionable forecasts of future events, not misrepresentation or omission of actual financial data or existing facts. *In re Verifone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993); *Apollo Capital Fund L.L.C., et al. v. Roth Capital Partners, L.L.C.*, 158 Cal. App. 4th 226, 241 (2007).

9 • Defendants' various statements were not rendered misleading without disclosure of the forecast that Netcentives was doomed to fail. Opp. at 20.

12 • The statements and omissions alleged in ¶¶ 30, 34, 43(c)-(f), (h), (j)-(l), and (n) are not actionable because there is no explanation of why the omission made some other statement false or misleading. Opp. at 21.

16 • Statements during the merger negotiations set out in paragraphs 52(i), 57(b)(i), 57(d), 57(e), and 55 are not actionable because Plaintiffs have not explained why they are false or misleading. Opp. at 21.

20 • Other allegations made in ¶¶ 59(b), (c), 32, and 48 are not actionable because the allegation of underlying falsity is insufficient. Opp. at 22.

23 • The Court already ruled that statements about the need for secondary financing were nonactionable statements of fact, but statements about the "value of the company." Opp. at 22.

27 • Allegations about a pre-IPO conspiracy between CSFB and Netcentives are not pled with sufficient particularity under Rule 9(b). Opp. at 23.

17

- Plaintiffs' entire theory is ridiculous, since the Prospectus had nine pages describing "Risk Factors," which explicitly said that Netcentives would incur losses for the "foreseeable future." Opp. at 23-24.

Although the Court will not exhaustively review each of these claims in light of the foregoing analysis of the prejudice and undue delay factors, it appears very likely that significant parts of the amendments will be futile based on precedent and prior rulings of this Court in the instant matter. Forecasts regarding future events are nonactionable, *In re Verifone Sec. Litig.*, 11 F.3d at 869; Plaintiffs' amendments on this topic would be futile. In its ruling of March 21, 2005 on the Defendants' Motion to Dismiss the Third Amended Complaint, this Court ruled that statements regarding the value of the company, including statements about secondary financing, are not actionable statements of fact. Order Granting in Part and Den. in Part the CSFB Defs.' Mot. to Dismiss, at 13. It thus appears that the Sixth Amended Complaint presents new claims of which at least parts are futile.

## V. Conclusion

For all of the reasons discussed above, IT IS HEREBY ORDERED that Plaintiffs' Motion for Leave to Amend is DENIED.

**IT IS SO ORDERED.**

Dated:   November 18, 2008

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

18